UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Jacob Elliott,                                              Case No. 0:18-cv-00403-NEB-KMM

          Petitioner,

v.                                                          REPORT AND RECOMMENDATION

Warden David Paul,

          Respondent.

Jacob Eilliott, Reg. No. 41959-424, FMC-Rochester, P.O. Box 4000, Rochester, MN 55903-4000, petitioner pro se

Ana H. Voss / Ann M. Bildtsen / David W. Fuller, United States Attorney's Office, counsel for respondent

      This matter is before the Court on Jacob Elliott's Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241. (Pet., ECF No. 1.) Mr. Elliott challenges two prison disciplinary decisions from October and December of 2017 that resulted in the loss of certain privileges and the forfeiture of good-conduct time. For the reasons discussed below, the Court recommends that the Petitioner's Application for Habeas Corpus Relief be **DENIED**.

I.    Background

      Mr. Elliott is an inmate housed at the Federal Medical Center in Rochester, Minnesota ("FMC-Rochester"). He is serving a 20-year prison sentence for exploitation of a child and possession of child pornography. (Boldt Decl. ¶ 8, Ex. B at 2, ECF No. 15.) With the accrual of good-conduct time, Mr. Elliott is projected to be released on February 23, 2030. (*Id.*)

1

Mr. Elliott has been disciplined twice since he has been in the custody of the United States Bureau of Prisons ("BOP"). (Boldt Decl. ¶ 9.) Specifically, he was reported to have violated prison rules in Incident Reports 30376422 and 3058341. (*Id.*) These Incident Reports led to the disciplinary decisions now at issue.

### BOP Discipline Procedures

When a staff member at a BOP facility witnesses an inmate commit a prohibited act or reasonably believes that the inmate committed a violation, he or she prepares an incident report. (Boldt Decl. ¶ 3; *id.* ¶ 2, Ex. A – Program Statement 52709.09 ("Inmate Discipline Program") § 541.5(a).) The inmate receives a copy of the incident report, usually within 24 hours. (*See* Inmate Discipline Process § 541.5(a).) The incident report is then forwarded to the appropriate Lieutenant in the prison, and the matter is investigated. (*Id.*) A supervisory level employee of the BOP (ordinarily a Lieutenant) is appointed as the investigating officer and should complete the investigation within 24 hours. (*Id.* § 541.5(b).)

Once the investigation of the incident is complete, the investigating officer refers the issue to the Unit Discipline Committee ("UDC") for an initial hearing. (Inmate Discipline Process § 541.7) The initial hearing ordinarily takes place within five days of the incident report being issued, but the Warden of the prison may approve a delay in that proceeding. (*Id.* § 541.7(c).) At the UDC hearing: the inmate can appear in person or electronically, or may waive his appearance, and the inmate can make a statement and present documentary evidence. (*Id.* § 541.7(d)–(e).) The UDC has three options at the initial hearing. It may: (1) find that the inmate committed the violation; (2) find that the inmate did not commit the prohibited act; or (3) refer the matter to a Discipline Hearing Officer ("DHO") for further consideration. (*Id.* § 541.7(a)(1)–(3).) More serious disciplinary violations are referred to the DHO. (*Id.* § 541.7(a)(4).) If the UDC refers the matter to the DHO, the inmate must be advised of his rights in the

2

DHO proceeding. (*Id.* § 541.7(g).) Once the UDC has reviewed an incident report, the inmate receives a written copy of the UDC's decision by the close of business on the next work day after the hearing. (*Id.* § 541.7(h).)

Once a DHO referral is made, the DHO must be an "impartial decision maker who was not a victim, witness, investigatory, or otherwise significantly involved in the incident." (Inmate Discipline Process § 541.8(b).) The inmate receives notice of the charges against him at least 24 hours before the DHO's hearing, though the inmate can waive that requirement, allowing the hearing to take place more quickly. (*Id.* § 541.8(c).) An inmate is allowed, upon request, to have a staff representative during the DHO hearing process. (*Id.* § 541.8(d).) The inmate can select the staff representative of his choice so long as that individual was not a victim, witness, investigator, or otherwise significantly involved in the incident. (*Id.*) The Warden will appoint a staff representative for the inmate if he is unable to adequately represent himself. (*Id.*) The staff representative: (1) can help the inmate understand the charges in the incident report and the potential consequences; (2) may speak with witnesses, obtain written statements, and otherwise help the inmate prepare evidence for the hearing; and (3) appear and assist the inmate during the hearing. (*Id.* § 541.8(d)(2).)

At the DHO hearing, the inmate can appear in person or electronically, but he may also waive his right to appear. (Inmate Discipline Process § 541.8(e).) The inmate may make a statement and present evidence in his defense and may request witnesses to appear at the hearing. However, the DHO may refuse a request for witnesses if that testimony would jeopardize institutional security or be repetitive. (*Id.* § 541.8(f).) The DHO will determine whether: (1) the inmate committed the act alleged in the incident report; (2) he did not commit the prohibited act; or (3) the matter should be referred back for further investigation, review, and disposition. (*Id.* § 541.8(a)(1)–3).) The DHO must provide the inmate with a copy of any written decision. (*Id.* § 541.8(h).) The written report documents: (1) whether the inmate was advised of rights during the DHO process; (2) what evidence the DHO relied on in reaching its decision;

(3) the DHO's decision; (4) the sanctions imposed; and (5) the reasons for the sanctions. (*Id.* § 541.8(h)(1)–(5).)

If it appears to BOP staff that an inmate is mentally ill during the discipline process, the matter is referred to a mental health professional who determines whether the inmate is responsible for his conduct and is competent to participate in the proceedings. (Inmate Discipline Process § 541.6.) The UDC or the DHO then decides whether the inmate can understand the nature of the disciplinary proceedings and help in his own defense and whether he was unable to appreciate the nature and quality, or wrongfulness of the act. (*Id.* § 541.6(a)–(b).) These decisions are based on evidence provided, including evidence presented by mental health staff. (*Id.*)

### Incident Report 3037642

Mr. Elliott challenges the discipline resulting from two incident reports. The first incident report alleges that Mr. Elliott violated a prison rule prohibiting tattooing and self-mutilation. (Boldt Decl. ¶ 10; *id.*, Ex. D ("IR 3037642").) On September 26, 2017, Mr. Elliott approached a nursing station in the behavioral health unit at FMC-Rochester and asked "what to do when you know someone may have hurt themselves." (IR 3037642 at 1.) Mr. Elliott was sent to the medical treatment room. He stated that he cut his arm with a razor and wrapped it in toilet paper to stop the bleeding. When the toilet paper covering his arm was removed, there were multiple lacerations of various lengths on his upper and lower left arm. Mr. Elliott informed staff that he cut his abdomen as well, lifted up his shirt, and revealed a series of lacerations forming a triangle. (IR 3037642 at 1, 4, 6.)

Lieutenant Hare investigated Incident Report 3037642, and interviewed Mr. Elliott. He advised Mr. Elliott that he did not have to discuss the incident but that his silence could be used to draw an inference against him. (IR 3037642 at 2.) Mr. Elliott acknowledged that he was advised of his rights and cooperated with the interview. Mr. Elliott stated: "It is something I have done in the past

4

also. I will try and talk with someone if I want to do it again before it happens." (*Id.*) Mr. Elliott also told a physician's assistant who treated him that "the pattern of lacerations [is] meaningful to him, but ... it is a long story and [he] [did] not want to discuss it." (*Id.* at 6.) The investigation was completed by Lieutenant Hare on September 29, 2017. (*Id.* at 2.)

Due to mental health concerns, FMC-Rochester staff decided to conduct a competency evaluation. On October 2, 2017, a BOP psychologist determined that Mr. Elliot was competent to understand the disciplinary proceedings and was responsible for his conduct at the time of the incident. (Boldt Decl. ¶ 12, Ex. E ("Competency Eval.").) The psychologist's report states that Mr. Elliott understood what he was doing when he cut himself, that he was attempting to punish himself, and that he intended to plead guilty and accept punishment. (Competency Eval. at 2.) Mr. Elliott stated: "I take full responsibility for my actions." (*Id.*; *see also* IR 3037642 at 1 ¶ 17.)

BOP records indicate that Mr. Elliott was provided notice of the charge (a copy of Incident Report 3037642) around 1:00 p.m. on September 26, 2017. (IR 3037642 at 1; *see also* Boldt Decl. ¶ 14, Ex. H ("First DHO Report") at 1 ¶ I.A.) On October 3, 2017, a UDC hearing was conducted. (IR 3037642 at 1.) Mr. Elliott did not request a witness to give a statement about the incident. (*Id.* at 2.) The UDC determined that the severity of the offense and the potential consequences warranted referral of the matter to the DHO for further hearing. (*Id.* at 1.) The UDC recommended forfeiture of 27 days of good conduct time and 30 days loss of commissary privileges. (*Id.*)

Mr. Elliott was advised of his rights for the DHO proceeding on October 3, 2017. (First DHO Report at 1 ¶ I.C.) He waived his right to have a staff representative present at the hearing. (First DHO Report at 1 ¶ II.A.) He also waived his right to present witnesses and documentary evidence. (First DHO Report at 1 ¶ III.C.1.) The DHO hearing was held on October 5, 2017, during which Mr. Elliott admitted his conduct. (First DHO report at 1 ¶¶ I.B., III.A.)

Based on that admission and the other evidence in the record, the DHO found that Mr. Elliott committed the act. (First DHO Report at 1 ¶ IV.) Mr. Elliott's punishment was: (1) disallowance of 27 days good-conduct time; (2) 30 days of commissary restrictions; and (3) 30 days of email restrictions. (First DHO Report at 2 ¶ VI; Boldt Decl. ¶ 16.) The DHO found that these sanctions were appropriate because Mr. Elliott's actions interfered with BOP's ability to maintain a safe and sterile environment for other inmates and staff. The DHO also found that the loss of good conduct time was mandatory for a PLRA inmate[1] and the loss of commissary and email privileges would deter further misconduct. (DHO Report at 3 ¶ 7.)

### Incident Report 3058341

Mr. Elliott was also disciplined for violating BOP rules prohibiting the use of drugs and alcohol, as documented in Incident Report 3058341. (Boldt Decl., Ex. I ("IR 3058341").) On November 8, 2017, Mr. Elliott provided a urine sample to Correctional Officer Schmidt. (IR 3058341 at 1.) Lab results were returned on November 17th and revealed that the sample tested positive for marijuana metabolite. (*Id.*) A pharmacist reviewed the relevant medical records and confirmed that Mr. Elliott did not receive prescribed medications that would have caused a positive test. (*Id.*) The Incident Report was delivered to Mr. Elliott on November 20, 2017. (*Id.*)

---

[1] Federal inmates lose "good conduct sentence credit as a mandatory disciplinary sanction if," like Mr. Elliott, the date of their "U.S. Code offense was on or after April 26, 1996, and, therefore, under the Prison Litigation Reform Act (PLRA)…." 28 C.F.R. § 541.4(a)(2). For such PLRA inmates, the "amount of good conduct sentence credit [they] will lose depends on the severity level of the prohibited act(s) committed," with at least 41 days forfeited for "greatest severity level offenses," and at least 27 days forfeited for "high severity level offenses." *Id.* § 541.4(b)(1)–(2).

Lieutenant Wieczorek was assigned as the investigator for the incident, and advised Mr. Elliott of his rights. (IR 3058341 at 2.) On November 28, 2017, the UDC held a hearing and referred the matter to the DHO for further hearing. (*Id.* at 1.) The UDC made this decision based on the severity of the offense and the applicable sanctions. (*Id.*) The UDC recommended forfeiture of 41 days good conduct time, 60 days loss of commissary privileges, and 60 days loss of email privileges. (*Id.*)

Again, FMC-Rochester decided to conduct a competency evaluation. On November 27, 2017, a prison psychologist determined that Mr. Elliott was competent to understand the disciplinary proceedings and that he was responsible for his conduct at the time of the incident. (Boldt Decl., Ex. J.) The psychologist interviewed Mr. Elliott regarding his drug use and he admitted to "using substances with three other peers." (*Id.* at 2.) Mr. Elliott expressed concern that he was the only one of the four inmates who received an incident report, indicating that he was confused by how that occurred. However, the psychologist noted that he was "able to engage in a meaningful conversation about his use and the disciplinary process, including potential outcomes." (*Id.*) The psychologist found that Mr. Elliott does not have a mental disease or defect that would render him incompetent and that he was responsible for his conduct based on a review of his records, his self-report, information related to the incident report, and interviews with treatment providers. (*Id.*)

On November 28, 2017, Mr. Elliott was advised of his rights in connection with the DHO hearing and received notice that the DHO hearing would take place on the next available date. (Boldt Decl., Ex. K & L.) Mr. Elliott indicated that he did not wish to have a staff representative and did not want to have witnesses or present documentary evidence at the DHO hearing. (Boldt Decl., Ex. L.) The DHO hearing was held on December 8, 2017. (Boldt Decl., Ex. M ("Second DHO Report") at 1 ¶ I.B.) At the hearing, Mr. Elliott admitted his conduct, stating that he was "sorry and takes full responsibility. He'll never do it again." (Second DHO Report at 1 ¶¶ IIIA. & III.B.)

7

The DHO found that Mr. Elliott committed the act as charged. (*Id.* at 2 ¶ IV.) The DHO relied on the positive lab results for Marijuana Metabolite, the pharmacist's confirmation that Mr. Elliott's medications would not cause such a positive result, a chain of custody form confirming that Mr. Elliott's urine sample was the item that was tested, Mr. Elliott's admissions, and his competency evaluation. (*Id.* at 2–3 ¶ V.) Mr. Elliott was sanctioned with forfeiture of 41 days good conduct time, 60 days loss of commissary privileges, and 60 days loss of email privileges. (*Id.* at 3 ¶ VI.) The DHO imposed these sanctions because the violation "threaten[ed] not only the health, safety and welfare of [Mr. Elliott], but that of all other inmates and staff within the institution." (*Id.* at 3 ¶ VII.) The DHO reasoned that the mere presence of drugs in a prison creates an environment conducive to violence, and the sanctions imposed would communicate to Mr. Elliott that he alone would be held responsible for his behavior. (*Id.*)

### Grounds Alleged in the Petition

Mr. Elliott challenges these two disciplinary decisions and the sanctions he received, arguing that the discipline was imposed following inadequate procedures and based on insufficient evidence. His Petition includes a numbered list of 23 separate grounds for relief.[2] (Pet. at 10.) However, the list of claims Mr. Elliott intends to litigate is somewhat unclear. His list does not clarify whether he intends each ground in the list to apply to both of the incident reports at issue. The matter is further complicated by the fact that Mr. Elliott's 23-item list is identical to one filed in another habeas proceeding filed by

---

[2]   The numbers introducing 20 of the 23 claims on his list have been stricken through with a diagonal mark. The remaining three 3 numbers do not have the same strikethrough. This could indicate that Mr. Elliott wants to raise each of the items on that list that have been stricken through, excluding the others. Alternatively, it could suggest that Mr. Elliott intends to raise only the three items that were not crossed through with the diagonal mark.

another inmate at FMC-Rochester in this District. *See Pinson v. Warden*, No. 17-cv-3790, Doc. No. 1-1 at 8 (D. Minn. Aug. 17, 2017). Despite this lack of clarity, the Court has considered all 23 of Mr. Elliott's potential claims.

The government filed a response to the Petition on March 26, 2018. (Gov't's Resp., ECF No. 11.) The government argues both that the Petition should be dismissed because Mr. Elliott failed to exhaust administrative remedies and because the claims lack merit. Mr. Elliott did not file a reply.

## II. Discussion

The BOP is responsible for administering the sentences of federal prisoners. *United States v. Wilson*, 503 U.S. 329, 333–35 (1992). Forfeiture of good-conduct time affects the length of a sentence, so a petition for a writ of habeas corpus is a proper vehicle for a challenge to a good-conduct-time sanction. *United States v. Tindall*, 455 F.3d 885, 888 (8th Cir. 2006). To obtain such a writ, Mr. Elliott must demonstrate that he is in custody in violation of the Constitution, the laws, or treaties of the United States. 28 U.S.C. § 2241(c)(3). Mr. Elliott challenges the procedures used by the BOP to discipline him for the two incident reports discussed above. Therefore, the Court construes his Petition as claiming that he was denied his constitutional right to receive due process.

### A. Due Process

The Court finds that the habeas petition should be denied on the merits because Mr. Elliott has not shown that he was denied due process.[3] Although the

---

[3] A court may determine that a federal prisoner's habeas petition concerning the computation of his sentence lacks merit without reaching the issue of exhaustion of administrative remedies because exhaustion is not a jurisdictional requirement. *Arellano v. Jett*, No. 10-cv-4833 (JNE/LIB), 2011 WL 3759830, at *2 n.3 (D. Minn. Aug. 5, 2011), *R&R adopted*, No. 10-cv-4833 (JNE/LIB), 2011 WL 3759814 (D. Minn. Aug. 25, 2011) (citing *Lueth v. Beach*,
(*footnoted continued on following page*)

"full panoply of rights due a defendant" in a criminal prosecution does not attach in a prison disciplinary proceeding, the loss of good time credit implicates a liberty interest and therefore low quantum of appropriate procedure is required. *Wolff v. McDonnell*, 418 U.S. 539, 556–57 (1974); *Flowers v. Anderson*, 661 F.3d 977, 980 (8th Cir. 2011); *Malek v. Camp*, 822 F.2d 812, 815 (8th Cir. 1987); *Brown v. Frey*, 807 F.2d 1407, 1411 (8th Cir. 1986). The Supreme Court has defined these minimum requirements of procedural due process as: "(1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement of the factfinder of the evidence relied on and the reasons for the disciplinary action." *Superintendent, Massachusetts Corr. Inst. v. Hill*, 472 U.S. 445, 454 (1985); *see also Espinoza v. Peterson*, 283 F.3d 949, 952 (8th Cir. 2002) (applying the *Hill* rule to review a loss of good time credits following a prison disciplinary hearing).

Based on the evidence in the record, Mr. Elliott received all of the constitutionally required procedural protections. First, although Mr. Elliott claims he "was never served a copy of the Incident Report prior to the DHO hearing" (*see* Pet. at 10 (claim #3)), the record shows that he received advance written notice of both of the disciplinary charges prior to the UDC and DHO proceedings. (IR 3037642 at 1 (notice of incident report); IR 3058341 at 1 (notice of incident report).) This claim provides no basis for relief.

Second, Mr. Elliott asserts that he was not given opportunities to call witnesses and present documentary evidence. (*See* Pet. at 10 (claims 8, 9, 11,

---

(*footnote continued from previous page*)
498 F.3d 795, 797 n.3 (8th Cir.2007) (the exhaustion requirement is judicially created, not jurisdictional)). The Court concludes that the Petition should be denied on the merits, but alternatively concludes below that Mr. Elliott also failed to exhaust his administrative remedies, warranting dismissal as well.

14, 15, 16, and 23).) The evidence in the record shows otherwise. Mr. Elliott was given an opportunity to have a staff representative, call witnesses, and present documentary evidence in his defense for both incident reports. However, he waived those protections prior to the UDC and DHO proceedings in each instance. (First DHO Report at 1 ¶¶ I.C., II.A., III.C.1.; Second DHO Report at 1 ¶¶ I.C., II.A., III.C.1.; Bolt Decl., Exs. G & L.) Mr. Elliott asserts that he was asked to sign certain waiver forms by the UDC, but was not permitted to read them, fill them out, or retain a copy, and he was told that if he asked for a copy his hearing would be terminated. (Pet. at 10 (claim 10).) Aside from the assertion in the tenth paragraph of Mr. Elliott's list of claims, there is no evidence in the record to support this allegation. Mr. Elliott has not provided any additional support or details concerning this accusation, and given that the claim is identical to that alleged in a different habeas proceeding filed previously by another inmate, the unsubstantiated allegation alone is unpersuasive.

Finally, Mr. Elliott also received a written statement of the factfinder concerning the evidence relied on and the reasons for the disciplinary actions from both the UDC and the DHO for both incidents. (IR 3037642 at 1 ¶¶ 14–16; IR 3058341 at 1 ¶¶ 14–16; First DHO Report; Second DHO Report.) Mr. Elliott's claim to the contrary lacks merit. (*See* Pet. at 10 (claims 7).)

For all these reasons, the Court finds that the procedures used by the BOP to impose discipline based on the incidents of self-harm and drug use at issue in this case were constitutionally adequate.

### B. Sufficiency of the Evidence

Even where the petitioner was afforded procedural due process, the Court must also determine whether there was sufficient evidence to support the sanctions imposed. Mr. Elliott claims that the DHO's findings were not supported

by any evidence. (*See* Pet. at 10 (claim 18).) For the reasons that follow, the Court disagrees.[4]

The disciplinary sanctions should be upheld "if 'some evidence' indicates the prisoner violated prison rules." *Eubanks v. Wilson*, No. 15-cv-2677 (PJS/DTS), 2017 WL 2303506 at *5 (D. Minn. May 1, 2017) (quoting *Hill*, 472 U.S. at 455), *R & R adopted*, 2017 WL 2303963 (May 25, 2017). This standard does not require the Court to examine the entire record, assess witness credibility, or weigh the evidence. *Id.* If there is any evidence that justifies the decision to discipline Mr. Elliott, the Court will defer to the determination of prison officials. *Id.* (citing *Gomez v. Graves*, 323 F.3d 610, 613 (8th Cir. 2003)).

For both the self-harm and the drug-use incidents at issue, there is sufficient evidence in the record to satisfy the "some evidence" standard. As detailed above, Mr. Elliott admitted on more than one occasion that he had cut himself and that he had engaged in drug use with other inmates. There is also photographic evidence to support the disciplinary sanction he received for violating the self-mutilation rule and positive lab test results to support the sanction for violating drug rules. These and the other findings of the DHO proceedings for both incidents were plainly supported by at least some evidence, so Mr. Elliott's due process challenge should be rejected. *See Gomez*, 323 F.3d at 612 ("[C]ourts are to give deference to prison officials and should intercede in prison discipline cases only when the sanctions are wholly unsupported by the record.").

---

[4] The Court also finds no support in the record to suggest that the incident reports were, as Mr. Elliott alleges, "false, fabricated by the reporting officer in retaliation for [his] legal activities." (*See* Pet. at 10 (claim 2).) The record does not even reveal any "legal activities" that might have subjected Mr. Elliott to retaliation.

### C. Remaining Claims

Mr. Elliott's also claims that: (1) the DHO used "improper prohibited act codes to determine guilt"; and (2) "[t]he DHO sanctions were excessive." (Pet. at 10 (claims 19 & 20).) The Court finds neither of these claims entitle Mr. Elliott to habeas relief. According to 28 C.F.R. § 541.3, the BOP's disciplinary codes indeed prohibit self-mutilation/tattooing as well was drug use. 28 C.F.R. § 541.3, Code 228 ("Tattooing and self-mutilation"); 28 C.F.R. § 541.3, Code 112 ("Use of any narcotics, marijuana, drugs, alcohol, intoxicants, or related paraphernalia, not prescribed by the medical staff"). The drug use violation is one of the "greatest severity level prohibited acts" in the BOP disciplinary scheme, and the available sanctions include disallowing between 27–41 days of good conduct time credit and the loss of privileges. *Id.* § 541.3, Table 1. The prohibited act code used to discipline Mr. Elliott for his violation of this prison rule was proper and he received sanctions within the limits provided by federal law. The same is true for the sanctions applicable to Mr. Elliott's violation of prison rules prohibiting self-harm. *See id.* § 541.3, Table 1 (identifying tattooing and self-mutilation as a "high severity level prohibited act," and authorizing sanctions loss of privileges, and forfeiture of up to 27 days of good conduct time credit). The DHO's disciplinary decisions in this case were neither excessive nor inconsistent with federal law.[5]

Mr. Elliott's remaining claims implicate the requirements laid out in the BOP's own regulations governing disciplinary proceedings. He asserts that: (1) the BOP did not advise him that the conduct he engaged in was prohibited by prison rules (Pet. at 10 (claim 1)); (2) the UDC hearing "was improperly delayed" (Pet. at 10 (claim 5)); (3) the "UDC did not consist of more than one unit team member" (Pet. at 10 (claim 6)); and (4) the DHO refused to audio or

---

[5] Indeed, 28 C.F.R. § 541.4(b)(1)–(2) require minimum loss of 41 days for the drug-related incident and 27 days for the self-harm incident because Mr. Elliott is a PLRA inmate.

13

video record the DHO proceedings (Pet. at 10 (claim 22)). Assuming that the BOP's failure to adhere to its own regulations could entitle an inmate to habeas relief in a procedural challenge to prison disciplinary sanctions, the Court concludes that Mr. Elliott is nevertheless entitled to no relief for these claims.

BOP regulations provide that prison officials must provide inmates with information about the disciplinary system in the institution, including the types of conduct that are considered prohibited acts. (Inmate Discipline Program at 5 ¶ 7 ("Notice to Inmate of the Inmate Discipline Program"; requiring staff to provide each inmate a copy of the prohibited acts and available sanctions "promptly after his/her arrival at an institution").) Mr. Elliott has provided no support for his assertion that the BOP failed to adhere to this requirement and did not advise him that self-harm and drug use are prohibited by prison rules.

As discussed above, the Inmate Discipline Program provides that a UDC will ordinarily review an incident report within five work days after the incident report is issued, unless the warden approves an extension. (Inmate Discipline Program § 541.7(c).) The self-harm incident report was issued on September 26, 2017, and the UDC review took place on October 3, 2017. The drug-use incident report was issued on November 20, 2017, and the UDC review took place on November 28, 2017. The Thanksgiving Holiday occurred during this period. Accounting for weekends and holidays, the UDC reviews for both incident reports occurred within the five-work-day period provided for by the Inmate Discipline Program. Mr. Elliott's claim that the UDC was improperly delayed lacks merit.

The Inmate Discipline Program also provides that a UDC ordinarily consists of two or more staff who are not victims, witnesses, investigators, or otherwise significantly involved in the incident. (Inmate Program Statement § 541.7(b).) However, "[o]ne staff member UDCs are permitted when other members are not reasonably available," and "[o]nly one unit staff member is required to hold an initial review when the incident report is required by policy

14

to be referred to the DHO." (*Id.*) Prohibited acts that are in the "greatest" or "high" severity category are automatically referred to the DHO for further review. (*Id.* § 541.7(a)(4).) Both the self-harm and drug-use incident reports were of this more serious nature under the rules. BOP's disciplinary procedures specifically authorized the use of a single staff member to conduct the UDC reviews in this case, so Mr. Elliott's complaint on this issue is also without merit.

Mr. Elliott's claim that the DHO failed to video or audio record the proceedings does not entitle him to any relief. The Inmate Discipline Program specifically provides that "[t]he DHO is not required to prepare a verbatim record of the hearing." (Inmate Discipline Program § 541.8(h).) Therefore, the absence of a video or audio recording of the DHO hearings in this matter does not mean that DHO failed to adhere to its own regulations.

Finally, several other claims that appear to implicate the BOP's adherence to its own regulations are contradicted by the record. Mr. Elliott was advised of his rights by the investigating lieutenants for both incidents, though he claims otherwise. (*See* Pet. at 10 (claim 4); IR 3037642 at 2; IR 3058341 at 2.) The evidence contradicts Mr. Elliott's assertion that the BOP failed to evaluate his competence and that any evaluation was inadequate. (*See* Pet. at 10 (claims 12 & 13); Boldt Decl. ¶ 12, Ex. E, Competency Eval.; Boldt Decl., Ex. J.) There is no indication in the record that Mr. Elliott requested accommodations for the DHO hearings for illness, illiteracy, or poor vision or hearing. (*See* Pet. at 10 (claim 21).) There is also no evidence to support Mr. Elliott's claim the DHO was not impartial and made biased statements concerning his sexual orientation. (*See* Pet. at 10 (claims 10 & 17).)

For all these reasons, Mr. Elliott's remaining claims entitle him to no relief and his Petition should be denied on the merits.

### D. Exhaustion of Administrative Remedies

As noted above, the government also argues that Mr. Elliott failed to use the administrative remedy appeal process to challenge the disciplinary decisions prior to filing his habeas petition. A federal prisoner seeking habeas relief from a decision of the BOP is required to exhaust administrative remedies prior to filing a § 2241 petition in federal district court. *United States v. Chappel*, 208 F.3d 1069, 1069–70 (8th Cir. 2000). Exhaustion of remedies is an affirmative defense. *See Luedtke v. Berkebile*, 704 F.3d 465, 466 (6th Cir. 2013). Although the Court has concluded that the Petition should be denied on the merits, it may alternatively be dismissed for failure to exhaust administrative remedies.

The government provides the Declaration of Jake Bush in support of its exhaustion argument. (Bush Decl., ECF No. 12.) Mr. Bush explains that there are four levels of the inmate administrative grievance procedure within the BOP: (1) informal resolution; (2) Request for Administrative Remedy; (3) appeal to the Regional Director; and (4) appeal to the Director, National Inmate Appeals, in the Office of the General Counsel in Washington, D.C. (Bush Decl. ¶ 7.) He further explains that BOP records used to track the submission of administrative appeals by Mr. Elliott show that he has filed 10 administrative remedy requests during his incarceration. (*Id.* ¶ 15.) These records reflect that Mr. Elliott filed several administrative remedy requests in 2014 through 2016 and in August and early September of 2017, all prior to the incident reports at issue in this proceeding. (*Id.*, Ex. B at 2–5.) Since that time, in January and February of 2018, Mr. Elliott filed a grievance on January 31, 2018, concerning an issue with medication, and another on February 5, 2018, which has to do with a mail restriction. (*Id.*, Ex. B at 6; *id.*, Exs. C & D.) Mr. Elliott has not filed any other administrative remedy appeals since a decision was provided on the mail-restriction grievance. (*Id.* ¶ 19.)

There is no evidence that Mr. Elliott made any attempt to appeal the DHO determinations for Incident Report 3037642 or 3058341. Mr. Bush's declaration

indicates that there is no record Mr. Elliott ever attempted to use any level of the BOP's four-step grievance procedures to seek administrative relief. Accordingly, the government has met its burden to demonstrate that Mr. Elliott failed to exhaust his administrative remedies prior to filing his Petition.

Mr. Elliott admits that he did not appeal either of the disciplinary decisions at issue. (Pet. at 2 ¶ 7.) However, he claims that he did not appeal because he never received a DHO report and a counselor refused to provide appeal forms. (*Id.* at 3 ¶ 7(b).) Mr. Elliott essentially argues that the administrative remedies he could have pursued were unavailable and he should be excused from his failure to exhaust. *See Fuller v. Rich*, 11 F.3d 61, 62 (5th Cir. 1994) (per curiam) ("Exceptions to the exhaustion requirement are appropriate where the available administrative remedies ... are unavailable...."); *see also Ross v. Blake*, 136 S. Ct. 1850, 1860 (2016) (noting in the context of the PLRA's statutory exhaustion requirement that prison officials can render a process for administrative remedies "unavailable" through "machination, misrepresentation, or intimidation").

Based on the record before the Court, these arguments are not persuasive. The evidence contradicts Mr. Elliott's assertion that he did not receive a copy of the DHO Report for either of these incidents. (Boldt Decl., Ex. H at 3 (indicating that Mr. Elliott was advised of his appeal rights and given a copy of the first DHO Report on Dec. 8, 2017); *id.*, Ex. M at 3 (indicating that Mr. Elliott was advised of his appeal rights and provided a copy of the Second DHO Report on Dec. 20, 2017).) His contention that BOP personnel refused to provide him with appeal forms is also not believable given that he was able to file administrative remedies requests in January and February of 2018 regarding other issues. (Bush Decl., Exs. C & D.)

Because Mr. Elliott has failed to exhaust his administrative remedies and there appears no valid reason on the record to excuse that failure, his habeas petition may be dismissed on this basis as well.

17

### III. Conclusion

The Court should deny Mr. Elliott's petition on the merits. First, the record shows that the Bureau of Prisons afforded Mr. Elliott sufficient due process. He received advance notice of the disciplinary charges against him for both incident reports. He was given an opportunity to call witnesses and present documentary evidence in his defense, and to have a staff representative assist him in the disciplinary proceedings, but he waived each of those rights. And he received a written report by the DHO of the evidence relied on and the reasons for the loss of good-conduct time and other sanctions. Moreover, the record shows that there is sufficient evidence to support the DHO's decisions to discipline him. Alternatively, Mr. Elliott's petition may properly be dismissed for failure to exhaust administrative remedies.

### IV. Recommendation

Based on the foregoing, the Court makes the following recommendations.

1. Jacob Elliott's Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241 should be **DENIED**.

2. This action should be **DISMISSED WITH PREJUDICE**.

Date: November 14, 2018              *s/ Katherine Menendez*
                                     Katherine Menendez
                                     United States Magistrate Judge

### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within

14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.